**Gail Killefer**, CSBN 157248
417 Montgomery Street, Suite 300
San Francisco, California  94104
Telephone:  (415) 362-8640
Facsimile:   (415) 383-8545

Terry Smiljanich (Florida Bar No. 145359)
Jill H. Bowman (Florida Bar No. 057304)
**JAMES HOYER NEWCOMER**
   **& SMILJANICH, P.A.**
4830 West Kennedy Boulevard, Suite 550
Tampa, FL  33609
Telephone:  (813) 286-4100
Facsimile:  (813) 286-4174

Douglas Bowdoin (Florida Bar No. 310360) (appearance pro hac vice)
**DOUGLAS BOWDOIN, P.A.**
255 South Orange Avenue, Suite 800
Orlando, FL  32801
Telephone:  (407) 422-0025
Facsimile:  (407) 843-2448

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN C. YEAGLEY, on behalf of himself and those similarly situated,<br><br>        Plaintiff,<br><br>        vs.<br><br>WELLS FARGO & COMPANY and WELLS FARGO BANK, N.A.,<br><br>        Defendants. | Case No.:  C-05-3403-CRB<br><br>**RESPONSE TO OBJECTIONS TO PROPOSED CLASS ACTION SETTLEMENT AND IN OPPOSITION TO OBJECTORS' MOTION(S) TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:      June 29, 2007<br>Time:      2:30 p.m.<br>Dept.:     Courtroom 8, 19th Floor<br>Judge:    The Hon. Charles Breyer |

        Plaintiff Stephen  C. Yeagley, by and through his undersigned attorneys,

hereby responds to objections to the proposed class action settlement and responds

in opposition to Objectors' requests to intervene.  For the reasons stated herein, the

objections should be over-ruled, Ms. Munoz's conditional Motion to Intervene

should be denied, and Mr. O'Dell request to intervene to raise matters unrelated to any issue in the case should be denied out-of-hand.

## I.     Introduction

Of the 3.8 million class members, only 25 filed objections to the proposed Settlement.  This is an infinitesimally small number when viewed as a percentage of the total Class Members who could have, but did not, object.  Of these 25[1] Class Members, five simply objected without explanation.  The remaining objections contained similar or overlapping objections.  Accordingly, for the Court's convenience, Class Counsel is responding to these objections in a single consolidated response.  The objectors claimed fault with:  (1) the value of the benefits to the class, (2) use of a claims process, and (3) the proposed attorneys' fees award.

Notably though, the objections are largely based on unhelpful speculations, opinions, suspicions, and innuendos – not hard facts.  "To allow the objectors to disrupt the settlement on the basis of nothing more than their unsupported suppositions would completely thwart the settlement process." *City of Detroit v.*

---

[1] Of these objectors, 3 expressly opted-out, and 1 stated a desire to preserve the right to file separately.  The standing of dual objection/opt-out notices are questionable in any event. "[A]ppellants trip immediately over our decision in Mayfield v. Barr, 985 F. 2d 1090 (D.C. Cir. 1993). There we held that class members who have opted out of a 23(b)(3) class action have no standing to object to a subsequent class settlement; by opting out they 'escape the binding effect of the class settlement.'"

Objector O'Dell requests to intervene to raise and insert into the case irrelevant and superfluous matters.  Class Counsel has not attempted to substantively address the matters concerning Mr. O'Dell, which reference the tragedy of 9/11 and clearly have no place in this litigation.  Mr. O'Dell's objections should plainly be over-ruled and his intervention request denied out-of-hand.

*Grinnell Corp.*, 495 F.2d 448, 464 (2d Cir. 1974); *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 235 (3d Cir. 2001) (discarding objections to notice that were based on speculation).   Against this backdrop, Class Counsel responds to the various objections.

Plaintiff also opposes the request by Class Member Munoz to intervene which Munoz already concedes is unnecessary to the preservation of her rights. And as noted above, Mr. O'Dell's intervention request should be denied out-of-hand.

## II.   The Settlement Provides Valuable Benefits to Class Members and is Not a Coupon Settlement

The objections related to the value of the benefit to the Class may be categorized as (A) those objectors who assume that the two credit reports have little or no value, (B) those objectors who assert that the benefit to the Class consists of coupons, and (C) an objector who claims the Settlement Benefits are no longer adequate given the supreme Court's decision in *Safeco Ins. Co. of America v. Burr*, 127 S.Ct. 2201 (2007).

### A.   Value of the Three Agency Credit Reports and FICO Scores

The Settlement Agreement makes available to each of the more than 3.8 million individual Class Members a credit report of the same type Wells Fargo would use in the extension of a first mortgage loan to a consumer, including the Class Member's current FICO score.  This credit report is not the widely available credit report a consumer can obtain once per year without charge from a single

credit bureau.  The credit report to be provided in this settlement consists of information provided by all three of the national credit bureaus in the form it would be obtained by a mortgage lender.

As explained by privacy expert Evan Hendricks there are a number of reasons a lender pulled three agency credit report is more valuable to a consumer than a free FACTA report.  There is a very important difference in how the system works when a consumer asks to see a copy of her own credit report, as opposed to how it works when a lender purchases a consumer's report from the CRA.  One reason for this is that the CRAs have a duty to ensure that they do not give a consumer's credit report to anyone who does not have a permissible purpose to see it—particularly someone who is trying to impersonate the consumer or otherwise do her harm.  Accordingly, when a consumer asks for their own report, the consumer is required to give extensive identifying information to authenticate herself—to prove that she is really her.  This also enables the CRA's algorithm to more concisely assign the proper accounts to her credit report.  Hendricks' Decl. ¶ 25.

However, it can be a very different story when a credit grantor or other subscriber asks for the consumer's credit report.  For starters, the setting is different.  To have instant access to credit reports, subscribers must sign contracts pledging to only use credit reports for permissible purposes, to abide by other

restrictions, and comply with the FCRA.  CRAs look at their subscribers as members of a trusted circle, who know and play by the rules. Hendricks  Decl. ¶ 26

Importantly, the priorities are different. Since the subscriber is buying the credit report in order to decide whether or not to grant the consumer credit, the CRA wants to ensure that it does not leave out anything that could be relevant to that decision.  After all, if the CRA failed to include evidence of late payments in the consumer's credit report, and the consumer defaults, the credit grantor is going to blame the CRA. Another factor is the credit grantor might only have limited information about the consumer, like name and address, and no SSN, or its employee might have written down the SSN incorrectly.  Therefore, the CRA seeks to maximize disclosure of any possible information that might relate to the consumer about whom a subscriber inquires.  Hendricks  Decl. ¶ 27.

To accomplish this, the CRAs' algorithms are designed to accommodate such errors as transposed digits within SSNs, misspellings, nick names, and changed last names (women who marry), and different addresses (people who move), by accepting "partial matches" of SSNs and first names, and in some circumstances, assigning less importance to last names. Hendricks' Decl. ¶ 28.  Thus, while a consumer must provide an exact match of your SSN to obtain his or her own credit report, a subscriber can still obtain your credit report even if there is a match of only seven of the nine digits in your SSN.  What's more: if the SSN on the credit application exactly matches the consumer, the CRAs' algorithms often will tolerate

major discrepancies in last name, street address, city, and state.  Hendricks Decl. ¶ 29

Accordingly, it's quite possible that the "subscriber" credit report sent to the company holding a consumer's credit application will have more data than the credit report a consumer obtained directly from the credit bureau. There have been occasions when a subscriber will reject an application for credit based on information in a credit report, but when the consumer gets her own report, the information isn't there. It was only in the subscriber report.  Hendricks Decl. ¶ 30. Again, consumers have no way of buying, or otherwise legally accessing a tri-merge report, unless they apply for a mortgage or refinance and the lender discloses the report to them.  Hendricks Decl. ¶ 31.

The most comparable product available to consumers in the market is often referred to as a "tri-merge credit report."  These tri-merge credit reports can be purchased by a consumer at retail prices ranging from $29.95 to $34.95, Smiljanich Decl. ¶ 26.  These are actual retail prices available to the consumers when the product is not purchased as a subpart of a larger package such as a subscription to a credit monitoring service.  Moreover, this class benefit which compares to retail products valued at $29.95 to $34.95 will be provided twice to each Class Member who submits both the claim form and the second request form.  Akin to credit monitoring, the provision of the two credit reports over time will further allow Class Members to examine their credit information and address the actual damages

to Class Members which have been stated as "small - a modest concern about privacy, a slight chance that information would leak out and lead to identity theft." *Murray v. GMAC*, 434 F.2d 948, 953 (7th Cir. 2006).

### B.   Other Benefits of the Settlement

Objectors also ignore the other benefits of the settlement including:

A.   A four page "Class Brochure" provided to each Class Member outlining the privacy protections afforded by the Fair Credit Reporting Act, the importance to each Class Member of the accuracy of their credit reports, and other educational information regarding such matters.

B.   Access for each Class Member to a web site containing further information and assistance.

C.   An individually mailed Class Notice to each Class Member, paid for by defendant Wells Fargo; and

D.   All attorneys' fees and costs of the Class paid for by Defendant Wells Fargo.

Smiljanich Decl. ¶ 25.

Indeed, the Class Notice itself provides an immediate benefit to class members by explaining to them that their credit information was obtained by Wells Fargo for possibly an impermissible purpose. The first step in consumer gaining reasonable control over their credit report data is to be informed of the practices of major players like Wells Fargo. The notice clearly informs consumers of what has happened, why it matters, and what they can do about it. Hendricks Decl. ¶ 37.

Second, the class notice conveys to consumers that their credit reports were accessed for purpose of promoting Wells Fargo's financial services. This fact alone has educational value to class members, as there are many consumers who do not realize that their credit report data are used for such purposes. (General Accounting

1  Office, "Credit Reporting Literacy: Consumers Understood the Basics but Could

2  Benefit from Targeted Educational Efforts" (GAO-05-223).

3  www.gao.gov/new.items/d05223.pdf).  Hendricks Decl. ¶ 38.

4  　　　Along with the class notice, class members received a brochure explaining

5  their rights under FCRA, the importance of credit reports in their financial lives,

6  and the importance of checking their credit reports for errors.  The significance of

7  the brochure is not only the educational information that it contains, but also the

8  fact that class members are receiving it at the same time that they are being

9  informed that they were subjected to adverse action or that their credit report may

10  have been improperly obtained.  As a result of this convergence of information, the

11  information in the brochure is particularly powerful.  The same information

12  conveyed to a consumer in the abstract typically would not be perceived as

13  important.  Hendricks Decl. ¶ 40.

14  　　　Recent surveys of consumers show that while there is growing awareness of

15  credit reports and credit scores, and of their importance, that understanding is by no

16  means universal.  For example, according to a July 2003 survey by the Consumer

17  Federation of America, "Only 25 percent of Americans – and less than 20 percent

18  of those with incomes below $35,000 – said they knew what their credit score was.

19  But only three percent of Americans could, unprompted, name the three main credit

20  bureaus – Experian, Equifax and Trans Union – that provide both lenders and

21  consumers with information from credit reports.  Forty-three percent of Americans

22  – only 35 percent of those with incomes below $35,000 – said they had obtained a

23  copy of their credit report from the three credit bureaus in the past two years. (CFA

24  Opinion Survey, July 2003, conducted by Opinion Research Corp.;

25  www.consumerfed.org/072803creditscores.html).  Hendricks Decl. ¶ 41.

26  　　　These additional benefits including the nominally valued brochure ($1)

27  amount to an additional $7.3 million dollars in benefits to Class Members.

28  Smiljanich Decl. ¶¶ 33-34.

**C.    The Value of the Settlement Benefits Do Not Include the Separate Rebate Offer**

Section 2 of the Settlement Agreement defines the settlement benefits available for Class Members and explains that the same includes only:

(i)    The Class Brochure explaining the importance of Class Members obtaining their own credit reports and explaining the Class Members' rights under the FCRA, a copy of which was included in each of the more than 3,800,000 packages sent by Wells Fargo to the Class Members;

(ii)    A copy of the Class Member's credit report described above which is compiled with information from all three of the national credit bureaus and presented to the Class Members in a format intended to enhance the consumers' understanding of the information presented;

(iii)    The Class Member's current FICO credit score; and

(iv)    For those Class Members who submit the initial claim form and also submit a subsequent second request, a second current credit report and current FICO credit score like those described above.

The Settlement Agreement actually explains in Paragraph 2.2 that the offer by Wells Fargo to provide a $50 rebate on a first mortgage loan is separate from and offered in addition to the class benefit.

Moreover, Class Counsel has never included in the value of the settlement any amount attributable to Wells Fargo's rebate offer.   Nor does Plaintiff or Class Counsel propose that this Court assign any value to the separate rebate offer.

Accordingly, the offer of a $50 rebate is not part of class counsel's valuation to the benefit to the Class.  Rather, the valuable credit report and FICO score benefits provided in the settlement, as described above, each have a real retail value of $29.95 to $34.95.  Smiljanich Decl. ¶ 26. And the brochure can be said to have a nominal value of $1.  Smiljanich Decl. ¶33.  Class Counsel has conservatively estimated the actual value available to each Class Member as no greater than $30, when on a retail basis the value is at least twice that amount.

### C.    Safeco Does Not Alter the Fairness and Adequacy of the Relief.

Finally, one Objector contends that the Settlement Benefits are inadequate in hindsight.  Specifically, the Objector points out that at the time of the settlement, the United States Supreme Court had accepted certiorari to consider the Ninth Circuit's opinion in *Reynolds v. Hartford Financial Services*, 435 F.3d 1081 (9th Cir. 2006), which held that the willfulness requirement of the FCRA is satisfied by a showing of reckless disregard of the requirements of the FCRA.

The Objector then contends, albeit wrongly, that at the time of the settlement there was a "widely held view that the Supreme Court would reject the definition of willful used by the Ninth Circuit."  Thus, according to the Objector, the settlement was influenced inappropriately by the uncertainty in the case law.  The Objector then goes on to contend that after the settlement was reached in this action, the Supreme Court's decision in *Safeco Ins. Co. of America v. Burr*, 127 S.Ct. 2201

(2007) strengthened Plaintiff's and Class Members' position – making the settlement inadequate.

The Objector's contention fails for numerous reasons.  There is no evidence of a "widely held view" that the Supreme Court would reject the Ninth Circuit's definition of willfulness.  To the contrary, Plaintiff and Class Counsel were confident that the United States Supreme Court would leave in tact the reckless disregard standard announced by the Ninth Circuit which was also previously adopted in the Third Circuit.  And, while *Safeco* did leave in tact the Ninth Circuit reckless disregard standard, it further held that recklessness should be evaluated objectively, arguably making it more difficult for Plaintiff to develop evidence in support of a willfulness claim not easier.  And, although Plaintiff and Class Counsel agree that Safeco does not substantially alter its likelihood of success on the merits, Plaintiff and Class Counsel still believe as they did when Plaintiff entered into the Settlement Agreement with Wells Fargo that the Settlement Benefits agreed upon are fair, adequate and reasonable. Nothing about the Safeco decision alters Plaintiff's or Class Counsel's view.

**III.  A Claims Procedure Was Necessary to Ensure Accurate Credit Report Were Provided and Every Class Member Received a Brochure**

Objectors' complaints that Class Members must submit claim forms to receive the Settlement Benefits are partially inaccurate and ignore the hard facts that in order to provide a three agency credit report to Class Members, Class

Members must supply their social security numbers and expressly authorize access to their credit information.

Notably, without doing anything, each of the 3.8 million Class Members received a brochure drafted by Plaintiff's counsel designed to educate consumers about their important rights under the Fair Credit Reporting Act and the importance of reviewing their own credit reports. This Settlement Benefit that might be nominally valued at $1 per Class Member was provided with the notice package to consumers at Wells Fargo's expense, and could be retained by the Class Member even if the Class Member ultimately determined to opt-out of the class and bring a separate claim against Wells Fargo.

And, contrary to one Objector's bald assertions, Wells Fargo could not simply send the credit report and FICO score Settlement Benefits to Class Members. This is because Class Members must expressly authorize the release of their credit information in the form of a credit report and FICO score, and must provide a social security number to ensure that the Class Member could be correctly identified and gain access to only his or her own credit information. The Settlement Benefits could not just be handed out, but had to be expressly authorized by Class Members.

Wells Fargo agreed to purchase the Settlement Benefits for each of the 3.8 million Class Members who submitted a valid claim form. There is no reversionary

fund.  No monies are being returned to Wells Fargo at the conclusion of the

Settlement process.

## IV.    Class Counsel's Requested Attorneys' Fees are Reasonable

The objectors also complain about Class Counsel's request for an award of

attorneys' fees and costs for various reasons.   Some claim that the fee is too high

when compared to individual Class Members' Settlement Benefits.  Others contend

that the award should be based on something other than the value of the Settlement

Benefits made available to Class Members.  And some wrongly contend that the

request for fees is tied to the $50 dollar rebate offer – when it is not.

Class Counsel has submitted ample evidence detailing the work done on

behalf of Class Members in the case and the expenses incurred in representing

Plaintiff and Class Members.  In addition, Plaintiff has also submitted the

Declaration of Michael Rubin, a well-respected authority on attorney's fees.  Mr.

Rubin opined that Class Counsel's fee viewed on a common fund basis based on

the valuable Settlement Benefits made available to 3.8 million class members

amounted to a remarkably modest 1% of the settlement value, when courts

routinely award 25%.  Mr. Rubin also opined that highly reputable Class Counsel's

hourly rates examined on a lodestar basis fell below those hourly rates customarily

charged in the community; and that Class Counsel's fee and expense request on

those modest rates still reflected only a 1.7 multiplier when courts routinely award

significantly greater multipliers.  Privacy expert Evan Hendricks also supports the

Court's award of counsel's fee which in his view is critical to encourage private enforcement critical to achieving its purposes.  Hendricks Decl. ¶ 57. This is more than sufficient to support Class Counsel's requested award of attorneys' fees and costs.

As to the Objections, it is inappropriate to compare Class Counsel's request for fees and expenses to an individual Class Member's Settlement Benefits.  Rather, Class Counsel's request for fees and expenses must be viewed as being spread over all 3.8 million Class Members who have been offered Settlement Benefits.   From this vantage point, Class Counsel's requested expenses and fees amount to a charge of less than 50 cents per class member for services rendered by Class Counsel – without actually reducing the Settlement Benefits available to Class Members, as Defendant has agreed to pay a fee award separately.

Nor is Class Counsel's fee request based in any part on the separate $50 rebate offer offered by Wells Fargo in addition to the Settlement Benefits.  To the contrary, Class Counsel was very careful to attribute no value to the rebate offer and has not attempted to support its request for attorneys' fees and costs with such rebate offer.

Finally, one Objector's suggestion that Class Counsel's award of attorneys' fees and expenses should not be based on the total value made available to the Class, but instead should be measured by only the value to those Class Members who requested benefits.  This suggestion ignores the law of the United States

Supreme Court and this Circuit.  This issue was addressed by the Ninth Circuit Court of Appeals in *Williams v. MGM-Pathe Communications Co.*, 129 F.3d 1026 (9th Cir. 1997).  In *Williams*, the district court calculated the amount of attorneys' fees to be paid by the defendant to the plaintiff's counsel based on the claims actually made by class members.  *Id.* At 1027.  In its opinion reversing the district court, the Ninth Circuit succinctly held that the attorneys' fees for a successful class action should be based upon the entire common fund created for the class, even if some class members make no claims.  *Id.*  The *Williams* opinion also stated that the parties to a class action may properly negotiate the payment of attorneys' fees.  *Id.*; *see also The Boeing Co. v. Van Gennert*, 444 U.S. 472 (1980) (plaintiffs' counsel's fees were properly awarded from the total fund available, including the unclaimed portion of the recovery, because each class member could obtain his or her share of the recovery).

Notably, Class Counsel expressly refused to negotiate the matter of attorneys' fees and expenses until after an agreement in principle was reached with Wells Fargo concerning the Settlement Benefits that would be provided to the Class.  Smiljanich Decl. ¶ 21; Smith Decl. ¶ 5.  And, Wells Fargo has agreed to pay the requested attorneys' fees and costs separately, without any reduction of the Settlement Benefits to Class Members.

Class Counsel's requested fees and expenses are also eminently reasonable when viewed on a lodestar and multiplier basis, which is appropriate especially

given that the Fair Credit Reporting Act provides for the recovery of attorneys' fees and expenses to a prevailing plaintiff that proves a willful violation such as Plaintiff alleged here.  15 U.S.C. § 1681n(a)(3)  And the 1.7 multiplier requested is on the low end of multipliers reasonably awarded in class action cases. Rubin Decl. 15.

**V.     Objectors' Requests to Intervene Should be Denied[1]**

In her objections, Class Member, Munoz, seeks to "intervene, if necessary, to lodge the objection contained herein."  In the same paragraph, however, Ms. Munoz concedes that intervention is unnecessary to preserve her right to object or file an appeal in this case, citing *Devlin v. Scardelletti*, 536 U.S. 1, 2 (2002) – a United States Supreme Court case which establishes that "nonamed class members ... who have objected in a timely manner to approval of a settlement at a fairness hearing have the power to bring an appeal without first intervening."  Since Munoz's rights are adequately protected under *Devlin* by her timely submission of an objection, intervention is unnecessary and should be denied.

Further, Munoz fails to meet the requirements of Rule 24 to intervene either as a matter of right or permissively, and even an unconditional request to intervene (which she has not made here) should be denied.

---

[1]   As noted above, Mr. O'Dell's request to intervene in an attempt to insert superfluous matters not appropriate to this litigation and should be rejected out-of-hand.  Accordingly, Class Counsel has not substantively addressed his request.

To intervene as a matter of right under Rule 24(a) of the Federal Rules of Civil Procedure, a party must satisfy the four-part test established in *Southwest Center for Biological Diversity v. Berg*, 268 F.3d 810, 817 (9th Cir. 2001):

> "(1) the application for intervention must be timely; (2) the applicant must have a 'significantly protectable' interest relating to the property or transaction that is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest must not be adequately represented by the existing parties in the lawsuit"

Failure to satisfy any one of these four requirements is fatal. *Arakaki v. Cayetano*, 324 F.3d 1078, 1083 (9th Cir. 2003).  Assuming *arguendo* that Ms. Munoz's application for intervention was timely,  and that she can prove that she has a protectable interest in the action, Munoz concededly fails to satisfy the third required element of the test for intervention as of right.

Put another way, Ms. Munoz is not entitled to intervene as a matter of right, because Ms. Munoz can not demonstrate that the ability to protect her interest is either impaired or impeded by the disposition of the instant action, as required for intervention as a matter of right.  As stated in the Notice sent to Munoz, she had a right to opt out and pursue an individual claim, or object to the proposed settlement. *See Cal ex rel. Lockyer v. U.S.*, 450 F.3d 436, 442 (9th Cir. 2006) ("Even if this lawsuit would *affect* the proposed intervenors' interests, their interests might not be *impaired* if they have 'other means' to protect them.") (quoting *U.S. v. Alisal Water Corp.*, 370 F.3d 915, 921 (9th Cir. 2004)).  Munoz did and does indeed have "other means" by which to protect her interests.  If Munoz disapproved of the terms of the

proposed settlement, she was free to opt-out and pursue her claims individually. *See Hawaii-Pacific Venture Capital Corp. v. Rothbard*, 564 F.2d 1343, 1346 (9th Cir. 1977) (holding that there is no impairment of rights where proposed intervenors could pursue individual claims in a separate action). Munoz was free to opt-out and file her own lawsuit against Wells Fargo if she believed that the terms of the proposed settlement in this case are undesirable or not in her best interest.

In addition, Munoz has the right to object to the settlement, and in fact, has already raised her objections within the same pleadings in which she conditionally requests to intervene. Munoz has conceded that she need not be granted the right to intervene in order to appeal a final judgment approving the class settlement in this case. (Docket Entry 110 p.10-11 citing *Devlin v. Scardelletti*, 536 U.S. 1, 2 (2002) (stating that "nonamed class members ... who have objected in a timely manner to approval of a settlement at a fairness hearing have the power to bring an appeal without first intervening")).

Further, where the right to appeal remains, a party's ability to protect her interest is not impeded or impaired. "A dissatisfied class member may object in the district court and may generally appeal an adverse decision." *Kinsley v. Network Associates, Inc.*, 312 F.3d 1123, 1125 (9th Cir. 2002); *see also Powers v. Eichen*, 229 F.3d 1249 (9th Cir. 2000). By acknowledging that "a motion to intervene is

unnecessary in order to preserve her right to appeal in this case," Munoz confirms that she may not intervene as a matter of right.[3]

Permissive intervention is also not warranted here.  Munoz has not identified any jurisdictional grounds independent of those asserted by the parties in this case, as required under Fed. R. Civ. P. 24(b).  And, in any event, intervention will not alter the right or standing of Munoz to "lodge her objection" or file an appeal, which is all she seeks to preserve the right to do. Ms. Munoz has objected and adequately preserved her right to appeal under *Devlin*.  The Court "retains 'broad discretion' to deny a motion for permissive intervention."  *Id.* (citing *Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir. 1998)).  Intervention is not required for the purposes requested by Ms. Munoz.  Thus, intervention should be denied.

## VI.   CONCLUSION

For the reasons stated herein, the Objections to the Settlement should be overruled and Ms. Munoz's Motion to Intervene should be denied.

---

[3]   Given that Ms. Munoz cannot demonstrate an impairment of her rights, there is no need for Class Counsel to address the fourth element of intervention as of right - that Ms. Munoz is adequately represented by the existing parties in the lawsuit.  However, Plaintiff and Class Counsel are plainly adequate.  Indeed, Judge Illston has recently found these same counsel to be adequate in its Order granting class certification in a legally identical case, *White v. E-Loan, Inc.*, No. C 05-02080 SI, 2006 WL 2411420, at *3 (N.D. Cal. Aug. 18, 2006).

Respectfully submitted,

JAMES, HOYER, NEWCOMER &
    SMILJANICH, P.A.

*s/ Terry A. Smiljanich*
Terry A. Smiljanich
(Appearance Pro Hac Vice)
Florida Bar No. 145359
4830 W. Kennedy Blvd., Suite 550
Tampa, FL 33609
Telephone: (813) 286-4100
Facsimile:  (813) 286-4174
Email: tsmiljanich@jameshoyer.com

GAIL KILLEFER, Esq.
417 Montgomery Street, Suite 300
San Francisco, CA 94104
Telephone: 415/362-8640
Facsimile: 415/383-8545
Email: gkillefer@aol.com

DOUGLAS BOWDOIN, PA
Douglas Bowdoin
Suite 800, Citrus Center
255 S. Orange Avenue
Orlando, FL 32801
Telephone:  (407) 422-0025
Facsimile: (407) 843-2448
Email: dbowdoin@bowdoinlaw.com

Counsel for Plaintiffs

## **PROOF OF SERVICE**

I, LaFaye Martin, declare as follows:

I, am a resident of the State of Florida, over the age of eighteen years, and not a party to the within action.  My business address is James, Hoyer, Newcomer & Smiljanich, P.A., 4830 W. Kennedy Blvd., Suite 550, Tampa, Florida 33609.

On June 22, 2007, at Tampa, Florida, I served the following document(s) listed below as follows:

**RESPONSE TO OBJECTIONS TO PROPOSED CLASS SETTLEMENT AND IN OPPOSITION TO OBJECTORS' MOTION(S) TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES**

▣   BY PERSONAL SERVICE: I caused a true and correct copy of the document(s) to be delivered to the persons shown on the attached list, through the Court's electronic court filing system.

☐   BY U.S. MAIL: I placed a true and correct copy of the document(s) in a sealed envelope with first class postage fully prepaid in the United States Mail at Tampa, Hillsborough County, Florida, addressed as shown on the attached list.

☐   BY FACSIMILE: I transmitted by facsimile a true and correct copy of the above referenced documents to the persons shown on the attached list.

Michael J. Steiner
Severson & Werson
One Embarcadero Center, Suite 2600
San Francisco, CA 94111

I am readily familiar with James, Hoyer's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.

Executed on June 22nd, 2007 at Tampa, Florida.

 /s/ LaFaye Martin
LaFaye Martin