1  GAIL KILLEFER, Esq. (California Bar No. 157248)
   417 Montgomery Street, Suite 300
2  San Francisco, CA 94104
   Telephone: 415/362-8640
3  Facsimlie: 415/383-8545

4  Terry Smiljanich (Florida Bar No. 145359)
   Jill H. Bowman (Florida Bar No. 0057304)
5  JAMES, HOYER, NEWCOMER & SMILJANICH, P.A.
   4830 West Kennedy Blvd.
6  Urban Centre One, Suite 550
   Tampa, FL  33609
7  Telephone:  813/286-4100
   Facsimile: 813/286-4174
8
   Douglas Bowdoin (Florida Bar No. 310360)
9  DOUGLAS BOWDOIN, P.A.
   255 S. Orange Avenue, Suite 800
10 Orlando, FL 32801
   Telephone: 407/422-0025
11 Facsimile: 407/843-2448

12 Attorneys for Plaintiffs

13
                UNITED STATES DISTRICT COURT
14
               NORTHERN DISTRICT OF CALIFORNIA
15

16 STEPHEN C. YEAGLEY, on behalf of      )  NO. C-05-3403-CRB
   himself and those similarly situated,  )
17                                        )  CLASS ACTION
                 Plaintiff,               )
18                                        )  DECLARATION  OF EVAN
        vs.                               )  HENDRICKS IN SUPPORT OF
19                                        )  PLAINTIFF'S MOTION FOR
   WELLS FARGO & COMPANY and              )  FINAL APPROVAL OF CLASS
20 WELLS FARGO BANK, N.A.,                )  ACTION SETTLEMENT AND
                                          )  AWARD OF COSTS AND
21               Defendants               )  ATTORNEY'S FEES
                                          )
22                                        )  Date:    June 29, 2007
                                          )  Time:    2:30 p.m.
23                                        )  Dept:    Courtroom 8, 19th Floor
   _____)  Judge:   The Hon. Charles Breyer
24

25

26 I, Evan Hendricks, hereby declare as follows:

27      1.      I am an expert in the field of consumer privacy and issues relating to

28

fair credit reporting.  At the request of counsel for the plaintiff in this case, I have evaluated the relief afforded under the proposed settlement agreement.  I also have been asked for my opinion as to whether the settlement is fair, reasonable and adequate.

2.      In my opinion, the settlement confers substantial benefits on both class members and the public at large.  A specific minimum monetary value can be placed on a few of the benefits – the two free tri-merge credit reports, two Experian-FICO credit scores notice, education brochure, and call center – based upon the cost of providing them.  As explained below, the minimal value of these benefits is $114 million.  Other benefits of the settlement will result in monetary benefits to class members, but I have not tried to predict with any certainty the specific dollars involved.  The remaining benefits of the settlement are intangible, but nonetheless real.

3.      It is my opinion as an expert in the field that the settlement is fair, reasonable and adequate and in the best interests of the class.

## QUALIFICATIONS

4.      I have been involved full time in the fields of privacy and fair credit reporting for nearly 30 years.  (CV Attached)

5.      Since 1981, I have been Editor/Publisher of *Privacy Times*, a bi-weekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act.  The newsletter ranges from 8 to 12 pages and is issued 23 times a year.  *Privacy Times* is a subscription-only newsletter. The readers are generally attorneys and specialists within government agencies, corporations, law firms, universities and public interest groups responsible for issues relating to freedom of information and privacy laws, including the FCRA and similar State statutes.  *Privacy Times* covers Congressional and State

legislative actions, judicial opinions, technology developments, industry trends and actions, executive branch policies and consumer news.  As a result of my work on the newsletter, I have accumulated a specialized body of knowledge in relation to the collection, use and disclosure of credit report data and personal financial information, and the standards governing them.

6.    I am author of the book, <u>Credit Scores And Credit Reports:  How The System Really Works, What You Can Do, 2nd Edition</u> (Privacy Times 2005).  As the title indicates, it describes how the credit scoring and credit reporting systems work and what consumers can do to obtain, read and understand their credit reports, correct errors in them, and enforce their rights.  I am also co-author of <u>Your Right To Privacy: A Basic Guide to Legal Rights In An Information Society</u> (2nd Edition, Southern Illinois University Press, 1990), which has a chapter on credit reporting.

7.   Since the early 1990s, I have served as an expert witness in numerous FCRA cases and have been qualified as an expert in fair credit reporting matters by federal and state courts,[1] including fairness hearings on FCRA class action settlements.[2]  As an expert witness, I have read thousands of pages of deposition

---

[1] *See Adelaide Andrews v. TRW, Inc.*, 225 F.3d 1063 (9th Cir. 2000); *Matthew Kirkpatrick v. Equifax Credit Information Services, et al.*, No. CV 02-1197-MO (U.S. District Court for the District of Oregon, 2005); *Joi Helmes v. Wachovia Bank N.A.*:  U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 01-81277-RGM;  *Denis W. Stasulis v. Suntrust*:  U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 04-12542-RGM;  *Arthur Spengler v. Sears Roebuck & Co.,*  Case No. C-03-0557 (Circuit Court, Wicomico County, Maryland, 2004); *Myra Coleman v. Trans Union LLC*, C.A. 4:98-CV-169B-B (U.S. District Court for the District of Mississippi); *Tammy Cochran v. C&M Motors, LLC, dba I-10 Toyota, et al*, No. CV-03-3568FMC (U.S. District Court for the Central District of California, 2005); *Scott E. Campbell v. G.E. Capital Auto Lease*, Case No. 99-522 (Circuit Court for St. Mary's County, Maryland, 2004); *Franklin F. Grizzard, Jr. v. Trans Union, L.L.C. & Equifax Information Services, L.L.C., et al.*, Nos. 04-CV-625 & 04-CV-626 (U.S. District Court for the District of Virginia). *Sandra Cortez vs. Trans Union, LLC*., (U.S. District Court for the Eastern District of Pennsylvania, 2007).

[2] *Dwaine Perry, et al. v. FleetBoston Financial Corp.*: U.S. District Court for the Eastern District of Pennsylvania: No. 04-507.  May 31, 2005 Fairness hearing before Judge Berle Schiller.  *Catherine Smith, et al. v. Progressive Corporation, et al.*: U.S. District Court for the Northern District of Florida, Case No.1:00-CV-210-MMP, August 23, 2006, Judge Paul presiding.  *Alex Campos and Michael York, v.*

3

testimony from credit reporting agencies ("CRAs") and credit "grantors" – the entities responsible for reporting data to CRAs.  This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and practices for handling personal data.  In fact, CRAs typically consider such procedures and practices to be proprietary and/or trade secrets.  To my knowledge, the best (and possibly only) sources for obtaining candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions from FCRA litigation.

8.     I have testified before Congress on numerous occasions – always by invitation – on issues related to the collection, maintenance, security, use and disclosure of sensitive personal data, including credit reports and other financial information. In 2007, I testified before the House Financial Services Committee's first oversight hearing on the FCRA's FACT Act Amendments, entitled, "Credit Reports: Consumers' Ability to Dispute and Change Information."[3]  I testified once before Congress in 2006, and three times In 2005.[4] In 2003, the year in which Congress was dedicated to a major upgrade of the FCRA, I testified twice before the Senate and twice before the House, and presented once before the FTC.  The hearings covered a wide range of credit reporting issues, accuracy, fairness,

_ChoicePoint Services, Inc._,: U.S. District Court for the Northern District of Georgia, CA No. 1-03-CV-3577-WSD, March 2, 2007, fairness hearing before Judge William S. Duffey, Jr.

[3] "Credit Reports: Consumers' Ability to Dispute and Change Information," House Financial Services Committee, June 19, 2007.  www.house.gov/apps/list/hearing/financialsvcs_dem/ht061907.shtml

[4] "Privacy in the Commercial World II," House Committee On Energy & Commerce Subcommittee On Commerce, Trade, and Consumer Protection, June 20, 2006;   "Financial Data Protection Act of 2005," House Financial Services Subcommittee on Financial Institutions and Consumer Credit," Nov. 9, 2005; http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=425; "Credit Card Data Processing: How Secure Is It?" House Financial Services Subcommittee on Oversight and Investigations, July 21, 2005; http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=407;  "Identity Theft: Recent Developments Involving the Security of Sensitive Consumer Information," Senate Banking Committee, March 15, 2005; http://banking.senate.gov/index.cfm?Fuseaction=Hearings.Detail&HearingID=144

privacy, CRA procedures and security.[5]  Some of my recommendations were reflected in the final FCRA Amendments approved by Congress and signed by President Bush in December 2003.

9.     From April 2002 through October 2004, I served on the Consumer Advisory Council of Experian (formerly TRW), a national CRA and vendor of other information services.  Before being disbanded in 2005, the Council met twice a year to advise the company on a host of credit reporting, marketing and other privacy-related topics.

10.     Since August 1998, I have served under contract as a member of the Social Security Administration's Panel of Privacy Experts advising the agency on a host of issues.  In 2002, the U.S. Postal Service retained me to review its Privacy Act notices to ensure they were understandable to the public and consistent with the goals of the Privacy Act.

## SCOPE OF WORK AND MATERIALS REVIEWED

11.     Plaintiff's counsel requested that I evaluate the fairness of the settlement and the value of the relief provided to the class.

12.     As detailed below, I believe that this settlement confers substantial benefits upon class members and has a monetary value well in excess of $ 114 million.  I also believe that its approval is in the best interest of the class and the

[5] "The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003; http://banking.senate.gov/03_07hrg/071003/index.htm; "The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003; http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=229;  "Database Security: Finding Out When Your Information Has Been Compromised," House Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003, "Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003, http://judiciary.senate.gov/testimony.cfm?id=983&wit_id=2790; "Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003, http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=202;  also see, "Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

public.

## OPINION REGARDING THE VALUE OF THE SETTLEMENT BENEFITS

13.     In my opinion, the settlement affords the following benefits:

- Two sets of three-in-one "trimerge" credit reports, the ones that are used by mortgage lenders such as Wells Fargo in evaluating mortgage and refinance applicants.  Moreover, class members are entitled to one FICO credit score based upon their Experian information.  By the most conservative estimate, the mere market value of each tri-merge with FICO score is $15.  The minimum value of two sets of tri-merge reports/FICO scores is $30, multiplied by 3.8 million class members, results in a minimal value to the class of $114 million.

- The tri-merge-plus-Experian/FICO package has a value greater than the mere market value because a consumer cannot purchase such a package on the open market – only mortgage lenders such as Well Fargo can.  Thus, to see a tri-merge report, a consumer normally must apply for a mortgage or refinancing, which creates an inquiry and which typically causes at least a slight drop in the applicant's credit score.

- Notification to class members that their credit information was obtained by Wells Fargo and allegedly used for an impermissible purpose, as Wells Fargo allegedly did not use class members' credit report data in connection with a firm offer of credit.

- Brochures that educated class members about their rights under the Fair Credit Reporting Act, the role that credit information plays in their financial lives, and the importance of checking their credit reports to ensure that the records are accurate, and to check their credit score so they will know how lenders will judge their creditworthiness.

- Notification, which also serves as a reminder, that they have the right to obtain a copy of their credit report.

- The services of class counsel.

After providing some background information concerning FCRA, I address each of these benefits individually below.

6

## BACKGROUND REGARDING THE FAIR CREDIT REPORTING ACT

14.     To understand the important value of this settlement to the class and the public, it is necessary to understand some of the practical principles underlying FCRA and the significance credit information has for the typical consumer.

## ACCURACY IN CREDIT INFORMATION

15.     FCRA reflects a recognition by Congress of the central role that information technology has assumed in our economy and represents a compromise between a consumer's interest in privacy and modern day commercial needs.  For FCRA to work as intended, it is crucial that consumer credit reports be as accurate as possible.  The significance of the need for accuracy is reflected in the Congressional findings and statement of purpose that begin the Act.  Indeed, the very first finding made by Congress is as follows:

> The banking system is dependant upon fair and accurate credit reporting.  Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

15 U.S.C. § 1681(a)(1).

## THE NEED FOR CONSUMERS TO CHECK THEIR CREDIT REPORTS FOR ERRORS

16.     It is critically important for consumers to check their credit reports regularly.  Concern about the accuracy of credit information is long-standing. Problems with accuracy prompted both the FTC and State Attorneys General to investigate all three CRAs and reach consent agreements with them.  That there is an unacceptably high level of errors in credit report data is indicated by numerous studies. (see Consumer Federation of America and National Credit Reporting Association, *Credit Score Accuracy and Implications for Consumers*, (December 2002); Robert Avery, Paul Calem, Glenn Canner, and Raphael Bostic, "An

Overview of Consumer Data and Credit Reporting," *Federal Reserve Bulletin*, February 2003); U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: A Look at Credit Report Errors," (June 2004)).

17.     The financial impact on consumers of such inaccuracies can be enormous.  Inaccurate, negative information can significantly drag down a credit score and result in the victimized consumer paying more for credit or insurance.  It could even cause rejection of a job applicant.

18.     Credit information is used to set the interest rates consumers pay for mortgages, refinancing, auto loans, and credit cards.  Credit information is also being used increasingly by insurance companies to set premiums.  The fundamental rule is that the lower a consumer's credit score, the more the consumer pays.  For example, according to the Fair Isaac web site, for a $300,000 30-year, fixed-rate mortgage, a consumer with a 760 FICO score would get a 6.148% interest rate, resulting in a monthly payment of $1,827.  On the other hand, a consumer with a 619 FICO score would get an 8.816% rate for a monthly payment of $2,374.  Thus, a difference of 141 points in the FICO score would result in a $547 increase in monthly payments for the lower score.  The difference is enough to cover a monthly payment for a new car. (www.myfico.com, visited May 2007.)

19.     What is essential to understand is that we have moved into an era of "risk-based" pricing.  Unlike the old days, when applicants were either approved or rejected for credit, in the current environment, the credit score is used to determine what rate a consumer should pay according his or her risk.  Moreover, because credit reports are updated continually, the credit score can change from month-to-month. The only way consumers can ensure that they are not disadvantaged by this increasingly dynamic environment is to check their credit reports regularly.

Indeed, consumers should check their credit reports before making any major purchases, applying for credit or insurance, changing jobs, buying insurance, or making significant financial decisions.

20.     Increasingly, there is another reason why consumers should check their credit reports on a regular basis – detection and prevention of identity theft. Once an isolated phenomenon, identity theft is a growing scourge that some believe is reaching epidemic proportions.  The FTC estimates that in 2003, ten million Americans were the victim of some form of identity theft, up from an estimated 6.9 million victims in 2002 and 3.4 million victims in 2001. (Federal Trade Commission – Identity Theft Survey (Sept. 2003) www.ftc.gov/os/2003/09/synovatereport.pdf) A 2004 survey by Javelin, Inc., a research firm, found there were 9.3 million victims last year. Significantly, a majority of respondents did not know how or from where their identity was stolen. MSNBC.com calculated that one out of ever 23 Americans has been a victim of some form of identity theft.

21.     Since these surveys were published, the numbers have continued to worsen.  According to Congressional testimony and news reports, between late 2004 and early 2005, the following organizations have admitted unauthorized access to data kept on large numbers of consumers:  ChoicePoint, 145,000 consumers (of whom 750 already have been confirmed as victims of identity theft); LexisNexis, 320,000 consumers; Bank of America, 1.2 million credit cardholders; DSW Shoe Warehouse, 1.4 million credit card account numbers; Polo Ralph Lauren/GM-branded MasterCard holders, 180,000 consumers.

22.     Identity theft victims report a wide range of problems, including wrongful bank and credit card charges, harassment by collectors, loan or insurance rejection, cut-off of utilities, civil lawsuits, and criminal investigations. Research

shows that most consumers learn they are victims in one of two unfortunate manners: either they are rejected for credit based upon unpaid accounts created by the identity thief, or they receive a collection call regarding the thief's unpaid account.

23.     Identity theft oftentimes can be detected earlier by reviewing a consumer's credit report, enabling a consumer to put a halt to the crime and mitigate the resulting damages. This is because the "Inquiries" section of the credit report shows who pulled the credit report and for what purpose. So, if you live in Virginia and a car dealer in Texas pulled your report – that's a red flag. A second place to check is the "credit history" section of the credit report. If there is an unpaid debt that is not yours, that could be another sign that identity theft has occurred.

## **THE ADDED VALUE OF A MORTGAGE 'TRI-MERGE' REPORT**

24.     To appreciate the added value of a tri-merge report, as compared to the report that the consumer receives upon a direct request, it is necessary to provide some additional background.

25.     There is a very important difference in how the system works when a consumer asks to see a copy of her own credit report, as opposed to how it works when a lender purchases her report from the CRA. One reason for this is that the CRAs have a duty to ensure that they do not give her credit report to anyone who does not have a permissible purpose to see it—particularly someone who is trying to impersonate her or otherwise do her harm. Accordingly, when she asks for her own report, she is required to give extensive identifying information to authenticate herself—to prove that she is really her. This also enables the CRA's algorithm to more concisely assign the proper accounts to her credit report.

26.     However, it can be a very different story when a credit grantor or other subscriber asks for her credit report.  For starters, the setting is different.  To have instant access to credit reports, subscribers must sign contracts pledging to only use credit reports for permissible purposes, to abide by other restrictions, and comply with the FCRA.  CRAs look at their subscribers as members of a trusted circle, who know and play by the rules.

27.     Importantly, the priorities are different. Since the subscriber is buying the credit report in order to decide whether or not to grant you credit, the CRA wants to ensure that it does not leave out anything that *could* be relevant to that decision.  After all, if the CRA failed to include evidence of late payments in your credit report, and you default, the credit grantor is going to blame the CRA. Another factor is the credit grantor might only have limited information about the consumer, like name and address, and no SSN, or its employee might have written down the SSN incorrectly. Therefore, the CRA seeks to maximize disclosure of any *possible* information that might relate to the consumer about whom a subscriber inquires.

28.     To accomplish this, the CRAs' algorithms are designed to accommodate such errors as transposed digits within SSNs, misspellings, nick names, and changed last names (women who marry), and different addresses (people who move), by accepting "partial matches" of SSNs and first names, and in some circumstances, assigning less importance to last names.

29.     Thus, while you must provide an exact match of your SSN to obtain your own credit report, a subscriber can still obtain your credit report even if there is a match of only seven of the nine digits in your SSN.  What's more: if the SSN on the credit application exactly matches yours, the CRAs' algorithms often will tolerate major discrepancies in last name, street address, city, and state.

11

30.     Accordingly, it's quite possible that the "subscriber" credit report sent to the company holding your credit application will have more data than the credit report you obtained directly from the credit bureau. There have been occasions when a subscriber will reject an application for credit based on information in a credit report, but when the consumer gets her own report, the information isn't there. It was only in the subscriber report.

31.     Again, consumers have no way of buying, or otherwise legally accessing a tri-merge report, unless they apply for a mortgage or refinance and the lender discloses the report to them.

## PROTECTION OF CONSUMER PRIVACY

32.     Another purpose underlying FCRA is that of protecting consumer privacy.  15 U.S.C. § 1681(a)(1).  Accordingly, the Act restricts the identity of those who may access a consumer's credit information and places limits on the purposes for which such information may be accessed.

33.     Unlike the adverse action notice that must be issued whenever there is a possibility that a consumer may have been disadvantaged by data in his credit report, the FCRA does not afford consumers a ready means of determining when their credit information has been accessed by an inappropriate person or for an improper purpose. A consumer, however, has a means for finding out if his credit report has been impermissibly accessed – that is, by checking his credit report himself.  As noted above, the "Inquiries" section of a credit report lists the identity of any people who recently accessed the consumer's information and specifies the reason given.

34.     Regular review of a consumer's credit report thus helps to detect invasions of privacy.  A vigilant consumer is perhaps the best means of ensuring that the privacy protections afforded by FCRA are carried out.

1

## BENEFITS AND VALUE OF THE SETTLEMENT

2

3

4

35.    The discussion above explores the benefits to class members of the tri-merge reports. In this section of my declaration, I will discuss other benefits of the settlement that I have identified and the value of each of them.

5

6

7

8

9

36.    The minimal market value of each tri-merge with a FICO score is $15. Thus, the minimal market value of two sets of tri-merge reports with FICO scores is $30.  The above discussion of the difference between subscriber-version credit reports and consumer disclosures should leave no doubt of the added value to class members of the tri-merge reports.

10

11

12

## NOTIFICATION TO CLASS MEMBERS THAT THEIR CREDIT INFORMATION  WAS OBTAINED BY WELLS FARGO FOR POSSIBLY IMPERMISSIBLE PURPOSES.

13

14

15

16

17

18

19

37.    An immediate benefit to class members from the settlement comes from the fact that they are each receiving a written notice that their credit information was obtained by Wells for possibly an impermissible purpose.  The first step in consumer gaining reasonable control over their credit report data is to be informed of the practices of major players like Wells.  The notice clearly informs consumers of what has happened, why it matters, and what they can do about it.

20

21

22

23

24

25

26

27

38.    Second, the class notice conveys to consumers that their credit reports were accessed for purpose of promoting Wells Fargo's financial services.  This fact alone has educational value to class members, as there are many consumers who do not realize that their credit report data are used for such purposes. (General Accounting Office, "Credit Reporting Literacy: Consumers Understood the Basics but Could Benefit from Targeted Educational Efforts" (GAO-05-223). www.gao.gov/new.items/d05223.pdf)

28

39.     Placing a dollar value on this educational benefit of the settlement is difficult because it is largely intangible.  However, one aspect of this benefit can be given a specific monetary value – the cost of providing the notice (and educational brochure) to each class member.

*(B)*     *Education of Class Members About Their Rights Under the Fair Credit Reporting Act, the Role That Credit Information Plays In Their Financial Lives, and The Importance of Checking Their Credit Reports to Ensure That the Reports Are Accurate.*

40.     Along with the class notice, class members received a brochure explaining their rights under FCRA, the importance of credit reports in their financial lives, and the importance of checking their credit reports for errors.  The significance of the brochure is not only the educational information that it contains, but also the fact that class members are receiving it at the same time that they are being informed that they were subjected to adverse action or that their credit report may have been improperly obtained.  As a result of this convergence of information, the information in the brochure is particularly powerful.  The same information conveyed to a consumer in the abstract typically would not be perceived as important.

41.     Recent surveys of consumers show that while there is growing awareness of credit reports and credit scores, and of their importance, that understanding is by no means universal.  For example, according to a July 2003 survey by the Consumer Federation of America, "Only 25 percent of Americans – and less than 20 percent of those with incomes below $35,000 – said they knew what their credit score was.  But only three percent of Americans could, unprompted, name the three main credit bureaus – Experian, Equifax and Trans Union – that provide both lenders and consumers with information from credit reports.  Forty-three percent of Americans – only 35 percent of those with incomes below $35,000 – said they had obtained a copy of their credit report from the three

credit bureaus in the past two years. (CFA Opinion Survey, July 2003, conducted by Opinion Research Corp.; www.consumerfed.org/072803creditscores.html)

42.    Although the educational component of the settlement is intangible, it is of substantial value.  Both government agencies and the Congress have commented on the need to increase consumer awareness about fair credit reporting matters.  For example, in adopting FACTA, Congress established a "financial literacy commission" charged with increasing such consumer awareness and envisioned that public monies would be spent for that purpose.  And, in a report issued in March, 2005, the General Accounting office concluded that while the public's understanding of credit reports and credit scores was improving, a federal education program was needed to better inform those segments of the population that remain unfamiliar with those matters.

43.    By placing the credit brochure in the hands of millions of Americans, this settlement significantly furthers consumer awareness of their rights under FCRA, serves an essential purpose of the Act, and jump-starts the recognized need for additional education efforts.  The only other instances of which I am aware in which so many consumers at one time had been given such a detailed, and readable brochure about fair credit matters were the class members in the 2005 Allstate case and the 2006 Progressive case.  As in those two cases, this feature of the settlement, standing alone, provides substantial value to class members, and at Wells Fargo's expense rather than through use of public funds.

**(C)  NOTIFICATION OF THE RIGHT TO OBTAIN COPIES OF THEIR TRI-MERGE REPORT**

44.    Another benefit of the settlement is that class members are notified that they have a right to receive a free credit report.  The value of this notification is substantial in my view.  Under current law, there are several situations where a consumer is entitled to receive a free credit report, such as upon receipt of an

adverse action notice, when a consumer has a right to such a report under the law of the state in which he lives, and in those parts of the country where such reports are already available under FACTA. However, experience has shown that consumers are much more likely to check their credit reports after receipt of a notice advising them of their right to do so.

45.     A recent study by the United States General Accounting Office (GAO) is illustrative. Based upon data collected by the Consumer Data Industry Association, an industry trade association, regarding the reasons consumers obtain their credit reports, the GAO study noted that: "84 percent of the disclosures followed an adverse action and only 5 percent of disclosures went to people who requested their reports out of curiosity." Thus, according to the GAO, the overwhelming bulk of credit reports are ordered by consumers after being notified of their rights as opposed to consumers who are checking their reports for other reasons. This finding led the GAO to further note that: "FTC staff stated that it is crucial that consumers receive adverse action notices so that they can obtain their credit reports and dispute any inaccurate information." (*Addressing Measures to Enhance the Operation of the Fair Credit Reporting Act: Hearing on H.R. 2622 Before the Senate Comm. on Banking, Housing and Urban Affairs*, 108th Cong. 6 (2003) (statement of Richard J. Hillman, Director, Financial Markets and Community Investment)

46.     The relevant literature, my experience in the field of fair credit reporting, and common sense confirm the findings of the GAO study. Consumers generally are not aware of all of the situations in which they are entitled to a free report, let alone of the importance of checking their credit report and their right to do so. Notwithstanding that it is advisable for consumers to regularly check their credit reports, relatively few do so. Absent a triggering event such as receipt of an adverse action report or detection of identity theft, a typical consumer simply is not likely to check their credit report unless prompted to do so.

47.     My understanding is that as a result of notices in previous class actions, a significant number of class members ordered their credit reports as of the date of this declaration.  The notice in the revised settlement is even more effective, in my opinion.

48.     Under the FACT Act Amendments to the FCRA, consumers are entitled to one free credit report per year from all of the CRAs.  In my opinion, this does not detract from the value of the two sets of tri-merge reports.  As discussed above, the tri-merge has greater value than the less robust reports that consumers receive when they request them directly. Moreover, a consumer should check his credit report prior to any major financial transaction, such as obtaining a new credit card, buying insurance, refinancing a home, or obtaining an auto loan.  Further, because of the increasing use of credit information in our society, other significant events with financial implications should trigger review of a credit report, such as applying for insurance or a new job.  By checking the credit report *prior to* a major credit transaction, the consumer can dispute errors with less stress, as he is not facing a mortgage, refinancing or auto loan deadline.  It also means that loan officers will not see negative information that could complicate the loan process. Thus, checking the credit report ahead of time can greatly reduce the damages that inaccuracies typically cause.

49.     In addition, because of the increasing problem of identity theft and the vagaries of the credit reporting system which can harm consumers without notice, in my opinion consumers would be well-served by checking their credit reports more than once a year, even if they are not going through a major financial transaction.

50.     Because checking credit reports more than once a year is advisable for consumers, the opportunity to receive a free credit report offered by this settlement is meaningful and provides valuable relief for class members, regardless of the fact that FACTA may entitle consumers to an additional credit report without charge.

For those class members who may already have exercised their right to obtain a free report under FACTA, the settlement provides benefit by enabling them to obtain another report for free, allowing them to detect identity theft and any inaccuracies in their reports.  And for those class members who have not used their right to a free credit report under FACTA, that right remains available to use at some future date.

**SAVINGS FOR PARTICULAR CLASS MEMBERS WHO DISCOVER AND CORRECT MATERIAL ERRORS IN THEIR CREDIT REPORTS AND THUS ARE ABLE TO REDUCE THEIR CURRENT AND FUTURE BORROWING COSTS, AS WELL AS SAVINGS FROM THE EARLY DETECTION OF IDENTITY THEFT**

51.    Given the size of the plaintiff class, many members likely are being adversely affected by material errors in the credit information maintained about them by CRAs, and, as a result, are overpaying for a variety of financial products. The settlement, by affording the opportunity to correct these errors, potentially could lead to class members realizing substantial savings through reduced interest charges, insurance premiums, and the like.

52.    I cannot identify the particular class members who are being adversely affected in this manner.  Nor can I quantify the amount that any particular class member would save by correcting their reports.  However, a hypothetical example illustrates the potential benefit on a class wide basis.  Assuming that only 10 percent of consumers have a material error on their credit reports, approximately 380,000 class members currently are paying more interest than they otherwise should.  If, for the sake of argument, affected class members each pay overcharges of $100, the total class benefit would be roughly $3.8 million.

53.    In addition, it is likely that some class members are victims of undetected identity theft.  The settlement affords these class members the potential

to stop any further damage they have suffered and ameliorate the other harmful effects of identity theft.

54.    The problems reported by identity theft victims are extensive, including wrongful bank and credit card charges, harassment by bill collectors, loan or insurance rejection, cut-off of utilities, civil lawsuits, and criminal investigations.  (Federal Trade Commission – Identity Theft Survey (Sept. 2003) at www.ftc.gov/os/2003/09/synovatereport.pdf.)  Cleaning up a credit report from the adverse effects of identity theft can be particularly difficult for consumers.  As then FTC Enforcement Chief Jodie Bernstein testified before Congress on March 7, 2000:

> A consumer's credit history is frequently scarred, and he or she typically must spend numerous hours sometimes over the course of months or even years contesting bills and straightening out credit reporting errors.  In the interim, the consumer victim may be denied loans, mortgages, a driver's license, and employment; a bad credit report may even prevent him or her from something as simple as opening up a new bank account at a time when other accounts are tainted and a new account is essential.  Moreover, even after the initial fraudulent bills are resolved, new fraudulent charges may continue to appear, requiring ongoing vigilance and effort by the victimized consumer. . . .
>
> Identity theft victims continue to face numerous obstacles to resolving the credit problems that frequently result from identity theft.  For example, many consumers must contact and re-contact creditors, credit bureaus, and debt collectors, often with frustrating results. . . .
>
> The leading complaints by identity theft victims against the consumer reporting agencies are that they provide inadequate assistance over the phone, or that they will not reinvestigate or correct an inaccurate entry in the consumer's credit report.  In one fairly typical case, the consumer reported that two years after initially notifying the consumer reporting agencies of the identity theft, following up with them numerous times by phone, and sending several copies of documents that they request, the suspect's address and other inaccurate information continues to appear on her credit report.

55.    According to a 2003 study of 173 victims by the Identity Resource Center (IRC).  ("Identity Theft: The Aftermath 2003," Identity Theft Resource Center (Sept. 2003); http://www.idtheftcenter.org/idaftermath.pdf)  The most severe damage from identity theft may well be the emotional distress that victims endure.  According to a credit analyst who worked with the IRC:  "While most surveys have focused on the financial costs to victims, these psychological impacts are generally unreported.  They may, however, have far worse consequences for victims."

56.    Because I am neither an economist nor statistician, I am reluctant to put a specific monetary value on the benefits of the settlement resulting from early detection of inaccuracies and identity theft and thus will not do so.  However, I would expect that for a class as large as this one the adverse financial impact is substantial.

## WORK OF CLASS COUNSEL

57.    The class has also benefited from the work of class counsel on their behalf.  Since I am not a lawyer, I will not comment on the specific value of those services.  However, I can state that it is important that the Court award fees to class counsel in cases under FCRA that are sufficient to encourage them to file cases.  In my experience, it can be difficult to find sophisticated counsel willing to handle FCRA cases.  More often than not, victims of FCRA violations do not suffer actual damages that can be readily proven or easily valued.  Their injuries may be to less tangible interests, such as privacy.  Settlement relief, moreover, may be difficult to measure.  Accordingly, class counsel in a FCRA case face financial risks that they may not face in other types of consumer litigation.  Unless understood by the courts, these added risks undercut private enforcement of the Act, which in my view is critical to achieving its purposes.

## OPINION REGARDING THE FAIRNESS OF THE SETTLEMENT

58.     I am not a lawyer.  However, I have a lot of practical knowledge regarding how the credit reporting system works and consumers behave in the real world.  I also am familiar with government investigations and enforcement actions that have occurred under FCRA, have participated as an expert in FCRA litigation, and have some familiarity with settlements in other such cases.  As a result, the court may find my views about fairness and adequacy of the settlement to be helpful.

59.     I believe that the settlement is in the best interest of both class members and the public and thus should be approved.  The settlement confers real and substantial benefits on the estimated 3.8 million class members, as I have already described.

60.     The minimal market value of the two sets of tri-merge reports with FICO scores is $30, multiplied by the 3.8 million class members, for a minimal settlement value of $114 million.

61.     By providing two sets of tri-merge reports with FICO scores, the settlement provides class members with valuable information that would not otherwise be available to them, nor required by the FCRA to be disclosed in advance of a mortgage application.  As I've discussed, several important benefits "flow downstream" from the provision of the tri-merge credit reports. Accordingly, I find the settlement to be fair and reasonable, bringing substantial benefit to the class.

62.     In accordance with the requirements of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


June 22, 2007                                    /s/Evan Hendricks_____

Date                                              Evan Hendricks

# *Evan D. Hendricks*

## *CURRICULUM VITAE*

**Professional Activities**

1981- Present        **Editor/Publisher** of ***Privacy Times***

Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA).  The newsletter ranges from 8-12 pages, 23 issues per year.  Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

**1992 – Present        Expert Witness**

Qualified by the federal courts in FCRA and identity theft cases.  (Complete list attached). I have read extensive deposition testimony by credit bureau and credit grantor personnel. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and practices for handling personal data, and the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation.

**1998 – Present        Privacy Expert Consultant, U.S. Social Security Administration**

Regularly review policies and practices in relation to the collection, use and disclosure of personal data and Social Security numbers and provide feedback and recommendations.

**2002 – 2004    Member, Experian Consumer Advisory Council**

Along with other Council members, I provide an outsider's view on credit reporting, marketing and other privacy issues.

**July – October 2002       Consultant to U.S. Postal Service**

Working with the USPS's Chief Privacy Officer, I assisted in reviewing and editing the re-write of the USPS's Privacy Act notices, with an emphasis on "Plain English."

---

Evan Hendricks          P.O. Box 302        Cabin John, MD 20818
              **(301) 229 7002  (301) 229 8011 [fax] evan@privacytimes.com**

---

**Recent Testimony Before Congress & The FTC**

"Credit Reports: Consumers' Ability to Dispute and Change Information," House Financial Services Committee, June 19, 2007.[1]

"Privacy in the Commercial World II," House Energy & Commerce Subcommittee On Commerce, Trade, and Consumer Protection, June 20, 2006[2]

"Financial Data Protection Act of 2005," House Financial Services Subcommittee on Financial Institutions and Consumer Credit," November 9, 2005[3]

"Credit Card Data Processing: How Secure Is It?" House Financial Services Subcommittee on Oversight and Investigations, July 21, 2005[4]

"Identity Theft: Recent Developments Involving the Security of Sensitive Consumer Information,"[5] Senate Banking Committee, March 15, 2005

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003[6]

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003[7]

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003[8]

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003[9]

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

---

[1] www.house.gov/apps/list/hearing/financialsvcs_dem/ht061907.shtml
[2] http://energycommerce.house.gov/108/Hearings/06202006hearing1938/Hendricks.pdf
[3] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=425
[4] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=407
[5] http://banking.senate.gov/index.cfm?Fuseaction=Hearings.Detail&HearingID=144
[6] http://banking.senate.gov/03_07hrg/071003/index.htm
[7] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=229
[8] http://judiciary.senate.gov/testimony.cfm?id=983&wit_id=2790
[9] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=202

**Books**

Credit Scores and Credit Reports: How The System Really Works, What You Can Do
[2nd Edition] (Privacy Times, 2005)

Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society (2nd Edition,
Southern Illinois University Press, 1990), (Includes a chapter on credit reporting)

Former Secrets: Government Records Made Public Through The Freedom of Information Act
(Campaign For Political Rights, 1982)

**International Lectures**

24th International Conference of Data Protection & Privacy Commissioners (Cardiff, Wales –
Presentation published in conference proceedings, 2002)
The 23rd International Conference of Data Protection Commissioners (Paris, La Sorbonne –
Presentation published in conference proceedings, 2001)
The 22nd Annual Conference on Data Protection (Venice, Italy -- 2000)
The 16th Annual Conference on Data Protection (The Hague, The Netherlands -- 1994).

In the 1980s, served as an expert consultant to both the Privacy Commissioner of Canada and
Privacy Commissioner of Australia.

**Presentations/Instruction At Recent CLE & Professional Seminars**

"11th Annual Consumer Financial Services Litigation," Practicing Law Institute, March 20-21,
2006 (New York City); 10th Annual, PLI, February 28- March 1, 2005 (New York City)
"Bankruptcy Roundtable," and, "Fair Credit Reporting Act Roundtable," National Consumer
Law Center, October 27, 2005
"Advanced Consumer Litigation," Texas Bar CLE, Feb. 10-11, 2005
"Financial Privacy Litigation," (Impact of FACT Act), Practicing Law Institute,
 "The New FACT Act: Challenge & Opprtny.," Privacy & American Business, Feb. 9-10, 2004
"Understanding the FACT Act And The Impact of Multi-Agency Rulewriting Process,"
Glasser LegalWorks, Sept. 28-29. 2004
"12th Annual National Conference," National Credit Reporting Association, Nov. 10-12, 2004

**Professional Societies**

Past President and Board Member, American Society of Access Professionals
www.accesspro.org

**Industry Certification**

FCRA Certification, National Credit Reporting Association (www.ncrainc.org).

**Media**

In addition to being a paid consultant and special guest on CNN's IMPACT news in 1996, I am quoted regularly by major and small newspapers (including *The Washington Post, New York Times, Wall Street Journal, Chicago Tribune, Los Angeles Times, Newsweek* and *Money Magazine*), regarding issues of privacy generally and the privacy implications of consumer reporting specifically. I have appeared on National Public Radio, PBS NewsHour with Jim Lehrer, ABC Nightline and World News Tonight, NBC Nightly News, CBS Evening News, CNN News Watch, CNBC, MSNBC, Fox News, various local affiliates, and the Oprah Winfrey Show and Geraldo, regarding these issues as well.

**Education**

Bachelor of Arts, Columbia College, Columbia University, New York, N.Y. (1979)