IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHEN YEAGLEY,<br><br>    Plaintiff,<br><br>v.<br><br>WELLS FARGO & COMPANY and<br>WELLS FARGO BANK, N.A.,<br><br>    Defendants._____/ | No. C 05-03403 CRB<br><br>**MEMORANDUM AND ORDER** |

This is a Fair Credit Reporting Act ("FCRA") nationwide class action. The parties reached a settlement which the Court approved. The Court must now resolve class counsel's motion for an award of $1.5 million in attorney's fees plus costs. The question presented is what is a reasonable attorney's fee for a virtually worthless settlement of a meritless case.

## BACKGROUND

**A. Allegations of the Class Action Complaint**

Under FCRA "[a] person shall not use or obtain a consumer report for any purpose unless --(1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section." 15 U.S.C. § 1681b(f). See Complaint ¶ 17. The permissible purposes generally arise only in connection with transactions initiated by the consumer (the subject of the credit report). Complaint ¶ 18. However, FCRA does

permit a person to obtain a credit report in the absence of a consumer-initiated transaction when the recipient of the credit report "undertakes to extend to the consumer a '<u>firm offer of credit</u>.'" <u>Id.</u> ¶ 19 (citing 15 U.S.C. § 1681b(c)(1)(B) (emphasis added)).

Defendant Wells Fargo "regularly obtains consumer reports on large numbers of individuals without their knowledge or consent by purchasing 'prescreening' lists from consumer reporting agencies." <u>Id.</u> ¶ 23. Wells Fargo subsequently mails written solicitations to individuals on the prescreening reports. <u>Id.</u> ¶ 24. Plaintiff alleges that these solicitations do not satisfy the "firm offer of credit" requirement of section 1681b(c)(1)(B), and therefore Wells Fargo's use of the credit reports to make the solicitations violates FCRA. <u>Id.</u> ¶¶ 32-37.

## B. Procedural History

Plaintiff filed this putative nationwide class action in August 2005 seeking injunctive and declaratory relief, statutory damages, and fees and costs. The original complaint alleged a class period of August 2003 through October 2005.

In January 2006 the Court granted Wells Fargo's motion to dismiss the claims for injunctive and declaratory relief on the ground that FCRA does not provide a private right of action for such relief. As a result of that ruling, the only claim remaining was plaintiff's claim for damages. As plaintiff did not assert that he or any of the class members suffered any *actual* damages, the class only had a claim for statutory damages. The class could recover statutory damages, however, only if they proved that Wells Fargo's alleged FCRA violation was "willful."

At the parties' request the Court stayed the case through October 2006 pending settlement negotiations. The parties subsequently stipulated to the filing of an amended complaint that decreased the original two-year class period to two and one-half months. The stipulation explains that plaintiff narrowed the class period because of plaintiff's belief that Wells Fargo has an advice of counsel defense for the original class period, but that such defense will fail for the two and one-half month period alleged in the amended complaint.

A few months later the parties reached a settlement and the Court set a date for preliminary approval. On March 28, 2007, the Court preliminarily approved the settlement.

2

## C. The Settlement Terms

As part of the settlement, each class member received with the Notice of Settlement a brochure prepared by class counsel concerning credit reports and FCRA. In addition, each member who submitted a timely claim form became eligible to receive two free credit reports that include the member's FICO score. The credit reports include merged reports from all three credit reporting agencies and are in the same form as would be provided to a mortgage lender. Wells Fargo must pay $15.50 for each credit report provided to a class member. The class member receives a second credit report only if the class member submits a second claim form after January 1, 2008. According to the parties, this delay is intended to ensure that a class member does not receive two credit reports at the same time. The class member can also check a box asking to receive a telephone call from a Wells Fargo mortgage consultant to discuss the offer of a $50 rebate on a mortgage loan.

The settlement requires Wells Fargo to pay class counsel's fees up to $1.5 million. The settlement is not conditioned upon the award of fees; in other words, the Court can award a different amount and the settlement is still valid.

## D. Class Response To The Settlement

On May 11, 2007, class notice was mailed to the 3.8 million class members who received the Wells Fargo mortgage solicitation during the class period. Class members had until June 8, 2007 to opt out and file objections. Approximately 231,000 notices were returned without forwarding addresses, and another 19,000 were returned with forwarding addresses and were forwarded. Another 686 pieces of mail were returned as undeliverable. Around 450 class members opted out and 25 or so filed written objections to the settlement. Three class members (two represented by counsel) filed objections and moved to intervene. Out of the original 3.8 million class members, only 29,168 have submitted timely, qualified claim forms, that is, less than one percent of the class chose to participate in the settlement.

After the Court approved the settlement, but while it still had counsel's motion for an award of attorney's fees under submission, the two represented objectors purported to withdraw their objections to counsel's fee request. They agreed to withdraw their objections

in return for class counsel's promise to pay the objectors' counsel a portion of the fees class counsel receive in this case. The amount class counsel agreed to pay is unrelated to the fees incurred by the objectors, and is instead tied to the amount the Court ultimately awards class counsel.

In any event, once a class member objects to a proposed settlement, or any portion of that settlement, the objection may be withdrawn only with the court's approval. Fed. R. Civ. P. 23(e)(4)(B). The Court does not approve the purported withdrawal of the objections. The reasons given for the withdrawal are unpersuasive and do not address the objectors' reasons for opposing the settlement and the requested fees in the first instance. The Court finds that class counsel simply "bought off" objectors' counsel. Approving the withdrawal of the objections under such circumstances is not in the interests of justice; instead, it will encourage attorneys to interject objections for the sole purpose of extracting a payment from class counsel.

## DISCUSSION

### I.     Settlement Approval

Before addressing the amount of attorney's fees to award class counsel, the Court will explain why it approved the settlement despite its nominal value to the class. Such discussion is critical to the attorney's fees determination.

Federal Rule of Civil Procedure 23(e) provides that if a settlement of a class action would bind class members, the court may approve the settlement "only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. (e)(2) (2008). "It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998). Id. The court does not "have the ability to delete, modify or substitute certain provisions. The settlement must stand or fall in its entirety." Id. (internal quotation marks and citation omitted).

"Assessing a settlement proposal requires the district court to balance a number of factors: the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration

4

of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." Id.

The Court finds that while the settlement offers little of value to the class, plaintiff's case is weak and the class could not do better if the Court rejected the settlement.

### A. Settlement Value

While the brochure mailed to all 3.8 million class members may have some educational value, all of the information provided is available elsewhere, including on the Internet. The likelihood that a class member actually read the brochure is low as is demonstrated by the extraordinarily low participation rate in the offer of a free credit report-- less than one percent. Class counsel has not offered any evidence that suggests that any class member actually read the brochure or that the same or similar brochures provided in similar cases have had any tangible impact.

The receipt of a tri-merged credit report with a FICO score is of only marginal value, and that value is only to the less than one percent of the class that submitted claim forms. See Acosta v. Trans Union, LLC, 243 F.R.D. 377, 390 (C.D. Cal. 2007) (noting that a class settlement of a free credit report with a FICO score has little actual value given that "few class members are likely to have any use for an additional free credit report, given that each class member is already entitled to at least one free credit report per year from each of the credit reporting bureaus and that fewer than 10% of consumers take advantage of their right to even one free credit report in any given year."). While as a general matter consumers are entitled to one free credit report a year from each credit reporting agency, participating class members will receive one report with information from all three agencies at once. They will also receive their FICO score which consumers usually can obtain for free only if they have been denied credit or applied for a loan. Wells Fargo pays $15.50 for each requested credit report. Assuming it will provide 35,000 reports, which is nearly 6,000 more than were timely and properly requested, it will pay $542,500.00 for this part of the settlement.

5

Class counsel argue that a consumer would have to pay $30 for a tri-merged credit report and therefore the Court should value the reports at $30 rather than the $15.50 that Wells Fargo paid. As is explained above, however, a consumer could obtain free credit reports from all three credit reporting agencies; thus, the value of the tri-merged credit report is the time a participating class member saved by not having to request free credit reports from three different agencies. Under such circumstances, the Court finds that $15.50 per credit report--the amount Wells Fargo actually paid for the credit report--is a reasonable assessment of the value of each provided credit report.

If a class member submits a second claim form *after* January 1, 2008, the member will receive a second credit report and FICO score. This part of the settlement, too, is of only nominal value. Less than one percent of the class submitted the claim form in the first place; the likelihood that any of this small number of class members will remember to mail in a second claim form after January 1, 2008 is extremely low and plaintiff offers no evidence to suggest otherwise. This is especially so given that the second claim form was provided to the class with the May 2007 class notice. In order to receive a second free credit report a class member must (1) keep the second claim form, (2) remember some time in 2008 that the class member can mail in the form to receive a free credit report, (3) find the claim form which the class member received seven months earlier, and (4) mail it to the settlement administrator. The Court accordingly finds that the offer of the second free credit report is of no value to the class.

If the less than one percent of the class that submitted a claim form checked a particular box on the form, a Wells Fargo representative will call the class member to discuss a $50 discount on a new mortgage. This "benefit" is a marketing opportunity for Wells Fargo and does not provide the class any tangible benefit; plaintiff does not claim otherwise.

Finally, the settlement requires Wells Fargo to pay class counsel up to $1.5 million in attorney's fees and costs, including the costs of class notice and settlement administration, depending on what the Court orders.

//

6

**B.      Strength Of Plaintiff's Case**

"Basic to [analyzing a proposed settlement] in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation." Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25 (1968). Here, the likely rewards of litigation are nearly nil.

Plaintiff's theory is that "firm offer of credit" in FCRA requires Wells Fargo to include in the written solicitation the definitive amount of credit and interest rate offered. Many courts have rejected this precise argument. See, e.g., Dixon v. Shamrock Financial Corp., 482 F.Supp.2d 172, 176 (D. Mass. 2007); McDonald v. Nelnet, Inc., 477 F.Supp.2d 1010, 1013 (E.D. Mo. 2007); Nasca v. J.P. Morgan Chase Bank, N.A., 2007 WL 678407, *3 (S.D.N.Y. March 5, 2007). The statute defines "firm offer of credit" as "any offer of credit or insurance to a consumer that will be honored if the consumer is determined, based on information in a consumer report on the consumer to meet the specific criteria used to select the consumer for the offer." 15 U.S.C. § 1681a(l). The statute does not expressly require the disclosure of interest rate and credit amount in the solicitation. Moreover, the Act itself provides that the offer can be conditioned upon information the lender obtains in the post-solicitation application and review of full credit report. Id. § 1681a(l)(1)-(3). While there is some suggestion in two Seventh Circuit opinions (in dicta or in an off-hand way), that a firm offer of credit must include interest rate and credit amount, the weight and trend of the law is in the other direction.

In any event, plaintiff has yet another hurdle: because the class members have suffered no actual damages, the class has only a claim for statutory damages, a claim which requires proof that Wells Fargo's alleged FCRA violation was "willful." In Safeco Ins. Co. of America v. Burr, the United States Supreme Court held that "willful" includes knowing violations and reckless violations, but that recklessness must be analyzed under an objective standard. "Thus, a company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated

with a reading that was merely careless." 127 S.Ct. 2201, 2215 (2007). Plaintiff cannot satisfy this burden in light of the plain language of the statute and the recent unanimous rulings of the district courts. If this case had proceeded to summary judgment it would have almost certainly resulted in a complete defeat for the class.

In this context, the limited settlement benefits are fair and reasonable. See In re Mego Fin. Corp. Secs. Litig., 213 F.3d 454, 458 (9th Cir. 2000). In other words, plaintiff's prospects for prevailing in this litigation are "so bleak as to render this a 'good value for a relatively weak case.'" Acosta, 243 F.R.D. at 392 (quoting Livingston v. Toyota Motor Sales USA, 1995 U.S. Dist. LEXIS 21757 (N.D. Cal. 1995)). Class members, or at least the less than one percent who requested a credit report, receive some value: the ease of requesting the first credit report and the value of receiving a report which includes information from all three credit reporting agencies in one document.

## II. Attorney's Fees

Having approved the settlement, the Court must determine the amount of attorney's fees to award class counsel. Class counsel seek $1.5 million in fees plus $33,000 in costs to be paid by Wells Fargo.

### A. The Court Must Scrutinize The Fee Request

Unlike most issues before the district court, an application for attorney's fees from a settlement fund is rarely contested. See In Re Quantum Health Resources, Inc., 962 F. Supp. 1254, 1256 (C.D. Cal. 1997). Here, Wells Fargo has contractually agreed not to challenge an award of up to $1.5 million; thus it cannot object to class counsel's fee request. Absent class members also infrequently oppose class counsel's fee application as they often do not have the resources to retain counsel to mount a credible objection. As there is no guarantee the court will award a class member attorney's fees incurred in opposing a fee application, the absent class member's potential gain from a reduced fee award must exceed the fees incurred in opposing the application to make the objection economically sensible. See In re Unisys Corp. Retiree Medical Benefits ERISA Litig., 886 F.Supp. 445, 457 n.17 (E.D. Pa. 1995) (fee applications in common fund cases are generally unopposed "because those parties with

a stake in the matter, the plaintiffs, are usually unorganized or lack the incentive to make challenges").

Despite this risk of nonpayment, the Court received many written objections to class counsel's requested fee award and two class members appeared through counsel to object. These two class members attempted to withdraw their objections only after class counsel agreed to share their fees with the objectors. These class members complain that the amount of fees requested is grossly disproportionate to--indeed, in excess of--the value of the settlement to the class.

Wells Fargo's agreement to pay class counsel's fees in addition to the relief provided to the class does not detract from the Court's obligation to carefully scrutinize the fee award. Staton v. Boeing Co., 327 F.3d 938, 964 (9th Cir. 2003). "Ordinarily, a defendant is interested only in disposing of the total claim asserted against it . . . the allocation between the class payment and the attorneys' fees is of little or no interest to the defense. . . ." Id. (internal quotation marks and citation omitted). Thus, the Court must closely scrutinize the fee application and determine an appropriate fee award based on the circumstances of this case. See Vizcaino v. Microsoft, 290 F.3d 1043, 1052 (9th Cir. 2002) ("Rubber-stamp approval, even in the absence of objections, is improper"); see also Zucker Occidental Petroleum Corp., 192 F.3d 1323, 1328 (9th Cir. 1999) ("In a class action, whether the attorneys' fees come from a common fund or are other paid, the district court must exercise its inherent authority to assure that the amount and mode of payment of attorneys' fees are fair and proper"); Fed. R. Civ. P. 23(b), Advisory Committee Notes, 2003 Amendments ("In a class action, the district court must ensure that the amount and mode of payment of attorney fees are fair and proper whether the fees come from a common fund or are otherwise paid. Even in the absence of objections, the court bears this responsibility.").

**B. A Reasonable Fee**

Class counsel agree that the Court has discretion to award fees based on a lodestar or percentage-of-the fund method. See Vizcaino, 290 F.3d at 1047. The only requirement is that the fee be reasonable under the circumstances. See Powers v. Eichen, 229 F.3d 1249,

9

1256 (9th Cir. 2000). The Court finds that in the specific circumstances of this case a reasonable attorney's fee is $331,875.00.

Unlike most common fund cases, Wells Fargo did not agree to pay a certain dollar amount to the class; instead, it agreed to pay for tri-merged credit reports to those class members who timely requested such reports. As the Court explained previously, a monetary value can be placed on this in-kind recovery; namely, $15.50 per requested credit report. Assuming 35,000 credit reports requested (5,000 more than actually reported to the Court after the deadline for requesting reports had expired), the settlement resulted in a benefit to the class valued at $542,500.00.

While there is no evidence in the record that suggests that the brochure had any tangible benefit to the class, the Court recognizes that some class members may have read the brochure and learned something of value. The Court will attribute a value of $500,000.00 to the brochure, an amount which the Court finds is generous in light of the minuscule class claim rate. See Fed. R. Civ. P. 23(h), Advisory Committee Notes, 2003 Amendments ("Settlements involving nonmonetary provisions for class members . . . deserve careful scrutiny to ensure that these provisions have actual value to the class."). Thus, the value of the "common fund," that is, the recovery to the class, is $1,042,500.00.

In cases in which the percentage-of-the-recovery method is used, the Ninth Circuit has adopted a 25 percent benchmark for an award of fees. See Powers, 229 F.3d at 1256. "A district court may depart from the benchmark but, '[i]f such an adjustment [to the benchmark] is warranted, . . . it must be made clear by the district court how it arrives at the figure ultimately awarded.'" Id. at 1256-57 (internal citation omitted).

The Court will adopt the 25 percent benchmark here. While the class participation rate in the settlement is minuscule, that fact is reflected in the amount of the common fund itself; thus, the Court need not reduce the percentage to reflect the class members' lack of enthusiasm for the settlement. Twenty-five percent of $1,042,500,00 is $260,625.00. The attorney's fees, however, should also be considered as part of the recovery on behalf of the class; if Wells Fargo did not pay the fees the class members would have to pay. And, in most

common fund cases, the fees are paid from the class recovery; thus, it makes sense to include the fees as part of the common fund. Accordingly, counsel should receive 25 percent of the $260,625.00 in fees, that is, an additional $65,156.00. The total amount of fees, then, is $325,781.00, which the Court will round up to $326,000.00, an amount that the Court finds is reasonable in light of the relative merits of the lawsuit and the value of the settlement.[1]

Class counsel contend that the Court must consider the amount Wells Fargo could have paid under the settlement in determining the common fund for the purpose of attorney's fees. They argue that under the Ninth Circuit's decision in <u>Williams v. MGM-Pathe Communications Co.</u>, 129 F.3d 1026 (9th Cir. 1997), the Court *must find* that since all 3.8 million class members could have made a claim for a free tri-merged credit report, the value of the recovery, that is, the common fund, is at least $114 million. Under this theory, class counsel's requested $1.5 million fee is a mere one percent of the common fund, a more than reasonable percentage.

<u>Williams</u> does not require this Court to adopt the fiction that the settlement is worth $114 million. <u>Williams</u> cites the Ninth Circuit decision in <u>Six (6) Mexican Workers v. Arizona Citrus Growers</u>, 904 F.2d 1301 (9th Cir. 1997), for the proposition that "attorneys for a successful class may recover a fee based on the entire common fund created for the class, even if some class members make no claims against the fund so that money remains in it that otherwise would be returned to the defendants." 129 F.3d at 1027 (citing <u>Six (6) Mexican Workers v. Arizona Citrus Growers</u>, 904 F.2d 1301, 1311 (9th Cir. 1997)). <u>Six (6) Mexican Workers</u> involved a judgment for statutory penalties per class member after a bench trial; accordingly, each class member had a calculable interest in the judgment, even if some of the class members could not be located and therefore never collected on their judgment.

<u>Williams</u>, in contrast, was a settlement of a securities-fraud class action for $4.5 million in cash. The class members' actual claims against those funds, however, were only

---

[1] The Court has not included the costs paid by Wells Fargo, including the costs of class notice, in its computation of the common fund. It is the Court's practice to subtract costs from any class recovery before determining attorney's fees as a percentage of the class recovery.

11

$10,000. 129 F.3d at 1027. The Ninth Circuit held it was an abuse of discretion for the district court to determine attorney's fees based on the $10,000 figure. The court acknowledged that unlike the class members in Six (6) Mexican Workers who had obtained a judgment after trial, the absent class members in Williams did "not necessarily have a calculable interest in the unclaimed money in the fund." Id. Nonetheless, the court held that the $4.5 million figure was the appropriate number to use for determining a fee based on a percentage "because it was in the settlement agreement, that the class attorneys would seek to recover fees based on the entire $4.5 million fund. The Defendants had some responsibility to negotiate at the outset for a smaller settlement fund if they wished to limit the fees." Id. In other words, Williams is based on the defendants' agreement to pay fees based on the larger amount.

The settlement agreement here, in contrast, does not represent that class counsel will seek fees based on the assertion that the settlement is worth at least $114 million. Indeed, the monetary value of the settlement is not anywhere described in the settlement agreement. Settlement Agreement, filed March 20, 2007, ¶ 2.01 (describing settlement benefits). Instead, Wells Fargo agreed to pay attorney's fees *not to exceed* $1.5 million; the parties' agreement thus expressly left open the possibility that the Court would award less than $1.5 million, and left unanswered the amount of the "common fund" for the purpose of computing a reasonable attorney's fee. In fact, the Court would not have approved the settlement had it required the Court to award $1.5 million in fees, or if it had purported to establish that the amount of the recovery for the purpose of setting attorney's fees is $114 million or even a fraction of that amount.

Class counsel's $114 million figure is pure fantasy. Counsel does not offer a shred of evidence that suggests that the parties reasonably believed that Wells Fargo would actually pay anything near that amount, and the Court finds that they did not. To accept class counsel's argument would "encourage the filing of needless lawsuits where, because the value of each class member's individual claim is small compared to the transaction costs in obtaining recovery, the actual distribution to the class will inevitably be minimal." Int'l

Precious Metal Corp. v. Waters, 530 U.S. 1223 (2000) (O, Connor, J., dissenting from denial of certiorari). Nothing in Williams requires the Court to follow such an approach.

The Court's consideration of the actual number of credit reports requested in determining an appropriate attorney's fee is consistent with the Class Action Fairness Act ("CAFA"), enacted before this lawsuit was filed. Under CAFA, in any class action settlement that provides for the recovery of coupons to a class member, "the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed." 28 U.S.C. § 1712(a). CAFA does not define "coupons." The settlement here arguably provided the class with a "coupon" for a free tri-merged credit report. On the other hand, the right to a free credit report is unlike a coupon in that it does not require a class member to do business with Wells Fargo and it entitles the class member to a whole product--a tri-merged credit report--rather than merely a discount. See Synfuel Technologies, Inc. v. DHL Express (USA), Inc., 463 F.3d 646, 654 (7th Cir. 2006).

Even if the free credit report does not fall under CAFA's "coupon" provisions, CAFA is still instructive. In support of CAFA Congress specifically found that "class members often receive little or no benefit from class actions, and are sometimes harmed, such as where–(A) Counsel are awarded large fees, while leaving class members with coupons or other awards of little or no value." Pub. L. 109-2, 119 Stat. 4, § 2(A)(3). The recovery here--free credit reports--had little value to the class, as is demonstrated by the meager claim rate. To reward class counsel $1.5 million without regard to the true value of the settlement would be to award counsel "large fees, while leaving class members with . . . awards of little or no value" in direct contravention of Congress's intent. A fee of approximately $326,000.00, in contrast, appropriately compensates class counsel for the benefits gained and the effort expended in the context of the questionable merits of the case.

Congress's CAFA findings highlight that one concern raised by a class action settlement in which the defendant agrees to pay class counsel's fees is that because the defendant only cares about how much it must pay in total, the parties will negotiate a

13

settlement that compensates class counsel at the expense of the class. See Staton, 327 F.3d at 964 ("If fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have obtained."). Although the record reflects that the parties negotiated the class benefit before any negotiations on the amount of attorney's fees, that concern is still present here. As the Third Circuit has noted, "[e]ven if the plaintiff's attorney does not consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation has indirect or subliminal effects on the negotiations." Court Awarded Attorney Fees, Report of the Third Circuit Task Force, 108 F.R.D. 237, 266 (1985).

> The concern is not merely one of controlling major abuse; indeed, an excessively high fee would not be allowed by the court in any event. The apprehension is rather for those situations, short of actual abuse, in which the client's interests are somewhat encroached upon by the attorney's interests. This type of conflict is not only one that is difficult to perceive on the face of a settlement proposal, but even the parties may not be aware that it exists at the time of their discussions.

Id. "In other words, the negotiation of class counsel's attorneys' fees is not exempt from the truism that there is no such thing as a free lunch." Staton, 327 F.3d at 964.

In any event, even if one could state with certainty that there was no such trade off here, that does not mean that the Court should blindly accept class counsel's fee request. Nor does the fact that any award less than $1.5 million will inure to Wells Fargo mean that the Court should award class counsel fees without consideration of the result obtained for the class. To award class counsel the same fee regardless of the claim participation rate, that is, regardless of the enthusiasm of the class for the benefits purportedly negotiated on their behalf, would reduce the incentive in future cases for class counsel to create a settlement which actually addresses the needs of the class. In this case, for example, the one percent claim rate demonstrates that the brochure did not effectively educate the class members about the importance of credit reports and monitoring their credit. If the Court takes that ineffectiveness into account in setting the fee, in future litigation class case counsel will design a settlement that actually reaches consumers, perhaps through a different mode of

14

communication. If the Court ignores the settlement's effectiveness, as class counsel urges, there is little incentive to design an effective settlement since they will receive the same fee regardless. Common sense dictates that a reasonable fee in a class action settlement is a fee that takes into account the actual results obtained.

The Court had considered whether to award class counsel its lodestar, and, in fact, referred the lodestar calculation to a Magistrate Judge for a Report and Recommendation. The Magistrate Judge did not conduct a detailed review of the reasonableness of class counsel's claimed lodestar, but even after a more general review recommended that the $969,000.00 lodestar be reduced by 10 percent. Even a 10 percent reduction, however, would result in an unreasonable fee; indeed, it would reward counsel with a fee worth more than the credit reports actually provided to the class. The Court notes further that many of the fees were incurred when this class action involved far more class members. More than a year and a half after this lawsuit was filed plaintiff voluntarily reduced the class period from two years to two and one-half months. Accordingly, the Court finds that percentage-of-the fund method is most appropriate here because it compensates class counsel based on the actual value provided to the class rather than the amount of time spent on a case with little merit.

## CONCLUSION

After carefully considering the entire record in this case, including class counsel's fee submission, the Court awards class counsel $326,000.00 in attorney's fees and $33,091.68 in unreimbursed expenses.

**IT IS SO ORDERED.**

Dated: Jan. 18, 2007

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE